620 F.2d 1220
 22 Fair Empl.Prac.Cas. 1362,
24 Wage & Hour Cas. (BN 728,
23 Empl. Prac. Dec. P 30,897,
23 Empl. Prac. Dec. P 31,024
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
KENOSHA UNIFIED SCHOOL DISTRICT NO. 1, Defendant-Appellee.
 Nos. 79-1676, 79-2042 and 79-2096.
 United States Court of Appeals,
Seventh Circuit.
 Heard Jan. 3, 1980.
Decided April 29, 1980.
As Modified on Denial of Rehearing May 9, 1980.
 
 William H. Ng., E.E.O.C., Washington, D.C., for plaintiff-appellant.
 Clifford G. Buelow, Milwaukee, Wis., for defendant-appellee.
 Before CUMMINGS and TONE, Circuit Judges, and McGARR, District Judge.*
 CUMMINGS, Circuit Judge.
 
 
 1
 Unified School District No. 1 of the City of Kenosha, Wisconsin, classifies its general custodial and maintenance employees as either custodians, who work in three shifts, and housekeepers or cleaners, who are either part-time or full-time.[1] Between 1970 and 1978, all but one of the cleaners were women and all but four of the custodians were men. The pay differential between second- and third-shift custodians on the one hand[2] and housekeepers or cleaners on the other was approximately $0.46 to $0.54 per hour. No special education or experience is required for any of these positions.
 
 
 2
 In 1973, the Secretary of Labor[3] commenced this action, alleging that the defendant School District's classifications violated the equal pay and overtime provisions of the Fair Labor Standards Act and that defendant had improperly withheld compensation owed its employees under the statute. In particular, the complaint asserted that by paying the cleaners rates less than the custodians, defendant was discriminating between employees on the basis of sex and was thereby violating Sections 6(d)(1) and 15(a)(2) of the Act (29 U.S.C. §§ 206(d) (1) and 215(a)(2))[4]. By subsequent amendment, plaintiff also alleged that defendant employed threats in violation of Section 15(a)(3) of the Act[5] to secure a petition from 29 of its 32 women cleaners to the Commission stating that they were completely satisfied with their jobs and requesting plaintiff to dismiss the lawsuit.
 
 
 3
 In a May 16, 1978 order before trial, the district court considered numerous defense motions seeking dismissal of the action for failure to prosecute, providing a "sham" witness list in violation of an earlier discovery order, and failing to develop a prima facie case. Defendant also sought to prevent Stanley Bloch, a Government rebuttal witness, from testifying because plaintiff had failed to comply with a March 31, 1978, court directive to produce documentary material held by this expert witness. Judge Warren had previously assessed plaintiff $100 for reasonable expenses and attorneys' fees incurred by defendant in obtaining the March 31 order compelling the Secretary to produce all of Bloch's reports. In the May 16 order, Judge Warren denied the motion to dismiss. He did, however, specifically rule that Bloch could not testify and again ordered plaintiff to narrow its witness list. At the same time, the district judge ordered plaintiff's counsel to pay reasonable expenses and attorneys' fees to defendant in the amount of $150 because of plaintiff's failure to name its trial witnesses.
 
 
 4
 At a bench trial, the parties stipulated to 76 uncontested facts and the Government called 14 witnesses to testify. At the close of the Government's case, the district court dismissed the action with prejudice. In an oral opinion Judge Warren reasoned that the female housekeepers or cleaners and the higher paid, largely male custodians did not have identical duties so that there was no violation of Section 6(d)(1) of the Act. Judge Warren also found that the defendant has not retaliated or threatened to retaliate against any employee who complained about its employment practices as proscribed by Section 15(a)(3) of the Act. He noted that defendant had merely told its employees in response to a question that "if the school district were required to pay housekeepers to perform the same duties it expects custodians to perform, and that if a housekeeper is unable to perform the duties which a custodian is expected to perform that the housekeeper will be terminated by the school district" (Com'n App. 28-29). Such a statement, he reasoned, was "a defensible position" because the school district would certainly be entitled to expect identical work from the employees if the Labor Department required defendant to treat all such workers alike because their jobs were identical.[6]
 
 
 5
 In a subsequent memorandum opinion filed on July 11, 1979, the district court reiterated its oral findings holding that the Commission had failed to make out a case for a Section 6(a)(1) violation because "the skill, effort and responsibility required in the performance of the jobs of custodian and cleaner in the Kenosha Unified School District, Number One is not 'substantially equal' " (Def.App. 2). In the same memorandum opinion, the court decided that although this lawsuit "may have been brought ill advisedly," it was not brought in bad faith, so that the defendant was not entitled to the $69,882 it sought in attorneys' fees. On the other hand, the district court applied its local rule 9.02(d)[7] and awarded defendant costs of $5,925.87 for expenses incurred in obtaining statistical analyses introduced into evidence by plaintiff and $915 for computer expenses. Finally, Judge Warren disallowed defendant's claim of an additional $20,417 for services of a consulting firm.
 
 
 6
 Plaintiff now appeals from Judge Warren's order dismissing the complaint with prejudice and his order precluding Bloch from testifying. It also asks us to reverse the district court's orders awarding defendant (1) $5,925.87 for its expenses in developing the statistical analyses, (2) $915 for computer expenses, (3) $100 for expenses and attorneys' fees in securing the March 31, 1978, order compelling Bloch to make his reports available and (4) $150 for expenses and attorneys' fees for the Government's initial failure to name its trial witnesses. Defendant has cross-appealed seeking reversal of Judge Warren's denial of attorneys' fees for the suit as a whole. We affirm Judge Warren's rulings in all respects on the merits, the exclusion of witness Bloch and his award of $6,840.87 in costs, but reverse his award of $100 for expenses and fees in compelling the Bloch discovery and the $150 awarded because of the Government's failure to supply an appropriate witness list.
 
 
 7
 I. Wages Paid for Cleaners and Custodians Were Not for Substantially Equal Work.
 
 
 8
 A. Proper Standards Were Employed Below.
 
 
 9
 To prove a violation of Section 6(d)(1) of the Equal Pay Provisions of the Fair Labor Standards Act (note 4 supra ) in this case, the Commission must show that the employer pays female employees less than male employees for substantially equal work. See Corning Glass Works v. Brennan, 417 U.S. 188, 203 n. 24, 94 S.Ct. 2223, 2232 n. 24, 41 L.Ed.2d 1; Hodgson v. Miller Brewing Co., 457 F.2d 221, 227 (7th Cir. 1972). The Commission initially argues that the district court erroneously held that to establish a violation of the Equal Pay provisions, the Government must show that the men and women performed identical work. Although Judge Warren used this term in his oral remarks at the conclusion of the Commission's case, he correctly applied the "substantially equal" work test in his July 11, 1979, memorandum and order (Def.App. 2). It is the July 11 order that controls in deciding this question.
 
 
 10
 The Commission next contends that the district court wrongly compared the cleaners' and custodians' job performance on an annual basis instead of considering the work performed in the summer and the various school vacation periods during the year as a separate and discrete part of each job. Although Section 7(a)(1) of the Fair Labor Standards Act (29 U.S.C. § 207(a)(1)) uses the work week as its general standard for determining whether minimum wages and overtime pay are due employees, the Equal Pay Provisions involved here do not specify a work week standard. Furthermore, the regulations of the Department of Labor provide that "it will generally be necessary to scrutinize the job as a whole and to look at the characteristics of the jobs being compared over a full work cycle" (29 C.F.R. § 800.119). Such a comparison is essential because "the kinds of activities required to perform a given job and the amount of time devoted to such activities may vary from time to time." Ibid. Separating the vacation periods from the year as a whole would in this case distort the true picture of the jobs at issue by artificially segregating those times when, despite the general continuity in the jobs, the differences in the tasks performed is greater. The problems associated with determining which days during the school year should be included in the vacation cycle and which in the regular cycle underscore the difficulty in the Commission's approach. Further, it is entirely possible that the differences in pay reflect in part the differences in the vacation period tasks, defendant having opted out of convenience to pay the difference over a twelve-month period. Accordingly, as in Marshall v. Dallas Independent School District, 605 F.2d 191 (5th Cir. 1979), the jobs here must be analyzed over the full school year. Indeed, we are advised that except in this case and the Dallas case, in the 16 years of Equal Pay Act litigation, the Commission has always analyzed jobs over the full work cycle (Def.Br. 28).
 
 
 11
 B. The Two Jobs Are Not Substantially Equal.
 
 
 12
 The record amply supports the district court's finding that the two jobs are not substantially equal. At the outset, it should be noted that the external evidence supplies little evidence of any explicit discrimination in paying wages for the jobs. Defendant has never segregated the jobs of cleaner and custodian on the basis of sex. On the contrary, the collective bargaining agreement, adopted with a union that represents both jobs and that is 36% female, has always made both jobs open to both sexes. That one job has primarily attracted men and the other women may suggest that the jobs are indeed unequal rather than that there has been some attempt to segregate the employees and pay them unequal wages. In addition, according to the stipulated facts, the pay differential was the product of union-requested evaluations by the State of Wisconsin's Bureau of Personnel, which specifically found that the custodians should be paid more than the cleaners. Initially performed in 1953, the evaluation was repeated in 1965, two years after the Equal Pay Act was adopted, and as the product of a state agency with expertise in the field, it is certainly entitled to the judicial deference ordinarily accorded bona fide job evaluations. Corning Glass Works v. Brennan, 417 U.S. 188, 201-203, 94 S.Ct. 2223, 2231-32, 41 L.Ed.2d 1. The union has always supported the differential and the record contains not the slightest suggestion of dissatisfaction with the differential by any female employee.
 
 
 13
 The substantially equal standard requires more than that the jobs be comparable and an important differentiating task that accounts for a substantial amount of time on the job is sufficient to vitiate an assertion of equality. In this case, two time surveys conducted by defendant and introduced into evidence by the Government amply demonstrated both that the custodians' jobs involved tasks not performed by the cleaners, requiring greater skill, effort and responsibility, and that the custodians devoted significant amounts of time to these extra duties. The district court summarized the differences in the two jobs by noting that the custodians' extra duties included
 
 
 14
 "the univent cleaning, taking apart of the univents, the furnace, the boilers, incineration responsibilities, wet mopping, plumbing repairs, changing of light bulbs, operations on ladders and scaffolds, snow shoveling, the responsibility for building security and setup for outside activities as well as monitoring outside activities, loading and unloading of goods and materials arriving at the various schools, to mention just a few of the criteria * * *." (Com'n App. 27).
 
 
 15
 According to the second survey, moreover, full-time cleaners spent only 24.3 hours on such extra duties over the course of a year while second-shift custodians spent 688.2 hours and third-shift custodians 817.9 hours over a comparable period (Def.App. 12). The corresponding percentages of time spent on extra duties were 1% for cleaners, 36% for second-shift custodians and 43% for third-shift custodians (Def.App. 11). No cleaner spent more time performing extra duties than any custodian. Even if the jobs were to be analyzed in terms of school days and vacation days, as urged by the Commission, the evidence shows a 21%-35% difference in the time spent on extra duties by custodians over cleaners on school days and of course higher differences on vacation days (Com'n App. 72-73).
 
 
 16
 Although unwilling to attack these findings frontally, the Commission suggests that the figures are misleading because of evidence that the cleaners could easily have taken on many of the extra duties. In some cases, the Commission's argument simply offends common sense. Thus although it has asserted that wet-mopping requires no special effort, anyone who has attempted the job knows otherwise and the Commission itself explicitly faulted defendant for failing to segregate this task in its first time survey. In addition, the legal significance of the EEOC argument is uncertain. That the employees in one classification could learn or adjust to the physical demands of tasks on the other job classification stems in part from the unskilled nature of both jobs and does not in itself suggest the substantial equality of the jobs under the statutory criteria. Indeed, given the evidence of differing responsibilities and effort associated with the two jobs, the Commission's argument could be compelling evidence of discrimination in this case only if the classifications are regarded as pretextual, a conclusion foreclosed by the indicia of good faith surrounding the adoption and application of the classifications.
 
 
 17
 The subjective evidence also supports the district court's conclusion. Every witness who was asked to compare the jobs testified that the jobs were not equal. One woman who had moved from cleaner to custodian, the only witness to have held both jobs, testified that the two jobs were different, that "everything was difficult" when she began the new job, and that it took time for her to adjust to the physical demands of the custodians' job (Def.Br. 14). The petition signed by 29 of the 32 cleaners, which the district court explicitly found was not the product of the employer's threats, is also evidence that the jobs are not substantially equal. Finally, the one cleaner who supported the Commission's position in her testimony was found to be not credible (Com'n App. 29) ostensibly because her time service sheets and prior affidavit contradicted her testimony. Given this evidence from the time survey sheets and testimony that the duties of the two jobs differed and accounted for significant portions of the custodians' jobs, the district court's judgment is not clearly erroneous and must stand.
 
 
 18
 II. The District Court's Discovery Sanctions Were Largely Permissible.
 
 
 19
 Judge Warren's May 16, 1978, ruling prohibiting Stanley Bloch, the Government's proposed rebuttal witness, from testifying was fully justified. The court had previously ordered the Government to produce Bloch's reports and the Government simply failed to comply. The trial judge must exercise his discretion to protect the discovery process and the integrity of the court (Hayden Stone, Inc. v. Brode, 508 F.2d 895, 897 (7th Cir. 1974)), and precluding testimony is a permissible sanction in the face of a party's failure to comply with discovery orders. See Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure. Given the Government's uncooperativeness, Judge Warren could properly have concluded that the sanction imposed, which was narrowly drawn according to the circumstances, was appropriate here. The Commission concedes, moreover, that there is no need to reverse the order given our disposition of the appeal on the merits (Br. 38).
 
 
 20
 The district court erred, however, in awarding defendant $100 in expenses and attorneys' fees in obtaining the original order compelling Bloch to testify and $150 for the Government's failure to produce a satisfactory list of trial witnesses. Since there was no showing that the Government attorneys were acting in bad faith, they could reasonably expect reimbursement from the United States. But assessments against the United States require some explicit authorization whereas neither Rule 37(f) of the Federal Rules of Civil Procedure nor 28 U.S.C. § 2412[8] permits an award of fees and expenses of attorneys against the United States. Indeed both suggest that such an award is forbidden absent clear statutory language to the contrary. See NAACP v. Civiletti, 609 F.2d 514, 516 (D.C.Cir.1979); Shannon v. United States Department of Housing & Urban Development, 577 F.2d 854, 855-856 (3d Cir. 1978), certiorari denied, 439 U.S. 1002. The qualified immunity accorded Government officers acting in good faith similarly protects the Commission attorneys from having to pay the award without reimbursement from the United States. Scheuer v. Rhodes, 416 U.S. 232, 239, 247-248, 94 S.Ct. 1683, 1687, 1692, 40 L.Ed.2d 90. For these reasons, the district court's award of fees and expenses against the Government is reversed.
 
 
 21
 III. Award to Defendant of Statistical Consulting Costs and Computer Expenses Was Permissible.
 
 
 22
 As noted, in its July 11 order, the district court awarded defendant $5,925.87 for its costs in procuring statistical analyses that plaintiff introduced into evidence and also awarded defendant $915 for computer expenses.[9] On appeal the parties do not differentiate between the two items allowed and therefore we will not do so. As has been noted, an assessment against the United States is not permissible in the absence of explicit statutory authority that may serve as a waiver of the Government's traditional immunity. Notwithstanding defendant's argument that local rule 9.02(d) (note 7 supra ) permits the court to make such an award, the equitable power of the judiciary cannot supply the necessary authorization in the absence of some statutory basis. Some authority for the award of costs is nevertheless available in 28 U.S.C. § 2412. Section 2412 expressly provides that a party prevailing against the Government may be awarded costs as set out in 28 U.S.C. § 1920 in an amount established by statute or court rule or order. The legislative history of the authorization in Section 2412 makes clear that the Section 1920 costs are at least the primary costs Congress intended to be available to a party prevailing against the Government even though the general intention of the legislation was to make the Government "liable for costs, the same as a private person." Senate Rep.No.1329, 89th Cong., 2d Sess., 1966 U.S.Code Cong. & Admin.News, pp. 2528-2529.
 
 
 23
 Section 1920(4) permits the award of costs for "(f)ees for exemplification and copies of papers necessarily obtained for use in the case." This authorization is ordinarily construed as permitting an award of the "reasonable expense of preparing maps, charts, graphs, photographs, motion pictures, photostats and kindred materials * * * when necessarily obtained for use in the case." 6 Moore's Federal Practice P 54.77(6) (2d ed.) at 1739 (citing cases). The statutory language as so construed would permit an award reimbursing defendant for its statistical analyses. The phrase "for use in the case" refers to materials actually prepared for use in presenting evidence to the court (ibid. at 1741), and here both surveys were introduced in evidence as part of the Commission's case. In authorizing costs against the Government in Section 2412, Congress refers to the costs taxable under Section 1920 generally as "court costs" (1966 U.S.Code Cong. & Admin.News at 2529), and Section 2412 itself restricts the available costs to those incurred "in the litigation." Both phrases reflect a legislative intent to allow costs incurred in developing materials such as surveys, graphs and charts to assist the court in understanding the evidence. Although these surveys were developed by defendant, they were used only by the Government in an effort to win its case. Not to charge the Government for them would be to give it a free ride. Rather than affording the Commission such an undeserved windfall, this use of the evidence by the Commission makes this an exceptional case enabling the district court to exercise its equity power to allow recovery of costs beyond the mere physical production of court materials.
 
 
 24
 Further support for this conclusion is drawn from the related context of costs available for the use of expert witnesses. Just as courts have permitted recovery against a private party of the cost of studies and surveys beyond the expense of mere physical production of such materials for use at trial (see Harrington v. Texaco, Inc., 339 F.2d 814, 822 (5th Cir. 1964), certiorari denied, 381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435), courts have awarded prevailing parties reimbursement for costs incurred by experts in undertaking the studies they may eventually use as part of their trial testimony. See Kaiser Industries Corp. v. McLouth Steel Corp., 50 F.R.D. 5, 13 (E.D.Mich.1970). In this case, defendant's costs in developing the surveys in fact reflected the cost of expert services (Br. 5), and the Commission has not satisfied us that defendant should not be reimbursed for such costs, particularly in the absence of any contrary case law cited by the Commission. The award of $6,840.87 in costs is thus affirmed as an appropriate exercise of its equity powers under local rule 9.02(d).
 
 
 25
 IV. The District Court Properly Denied Defendant's Request for Attorneys' Fees.
 
 
 26
 Also in its order of July 11, the district court denied defendant's request of $69,882 in attorneys' fees to be assessed against the Commission. On appeal, the defendant first contends it is entitled to attorneys' fees because plaintiff's claim that defendant threatened its employees in violation of Section 15(a)(3) of the Act (note 5 supra ) was totally without merit. The district court did not abuse its discretion in denying the award. Judge Warren plainly regarded the Commission's charge as a serious one and weighed the testimony about it very carefully before finding there was no threat of retaliation (Com'n App. 24, 28-29). Moreover, the district court concluded that the entire lawsuit was reasonable and brought in good faith (Def.App. 5). It follows that attorneys' fees were not justified on the theory that the Section 15(a)(3) allegations were frivolous and in bad faith. In addition, as noted, Section 2412 of the United States Code (note 8 supra ) bars recovery of attorneys' fees against the United States unless specifically provided by statute (cf. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 264 n. 37, 95 S.Ct. 1612, 1625 n. 37, 44 L.Ed.2d 141), and Section 16(b) of the Fair Labor Standards Act (29 U.S.C. § 216(b)) permits an award only to prevailing private plaintiffs suing their employers.
 
 
 27
 Defendant also cannot prevail upon its additional argument that construing Section 2412 to deny him attorneys' fees for the suit as a whole under the Equal Pay Provisions violates his equal protection rights given the availability of such fees against the Government under Title VII. We are told that defendant failed to raise this issue below, so that under well-settled principles of appellate procedure that issue is not properly before this Court.[10]
 
 
 28
 The dismissal of the action is affirmed. The order of May 16 barring Stanley Bloch from testifying is affirmed. The orders of March 31 and May 16 are reversed insofar as they impose expenses and attorneys' fees against plaintiff's counsel. The order of July 11 is affirmed insofar as it denies the defendant attorneys' fees and affirmed insofar as it awards defendant $6,840.87 in costs. Costs on appeal will be taxed against the Commission.
 
 
 
 *
 The Honorable Frank J. McGarr, District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The names housekeepers, cleaners, and janitresses have at various times been applied to this latter group of employees. It was stipulated that the names are of no significance (Com'n App. 44). Part-time cleaners do not work during the two summer months
 
 
 [2]
 Because the Commission has never asserted that their jobs were equal to those of the cleaners, the first-shift custodians are not at issue in this case. It is worth noting that these first-shift custodians received the same pay as the second-shift custodians after allowing for a small night-shift differential
 
 
 [3]
 Congress transferred the Secretary's enforcement responsibilities under the Equal Pay Provisions to the Equal Employment Opportunity Commission on July 1, 1979. As a result, the Commission was subsequently substituted as the plaintiff in this case
 
 
 [4]
 Section 6(d)(1) provides
 "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee" (29 U.S.C. § 206(d)(1)).
 Section 15(a)(2) makes it unlawful for any person to violate Sections 6 or 7 of the Act.
 The Secretary also originally accused defendant of violating Sections 7 and 15(a)(2) of the Act (29 U.S.C. §§ 207 and 215(a)(2)) by employing several persons for work weeks longer than 40 hours without compensating them at the one and one-half time statutory rate for overtime, but this charge was dismissed in 1976 in view of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245.
 
 
 [5]
 Section 15(a)(3) makes it unlawful for any person
 "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee" (29 U.S.C. § 215(a)(3)).
 
 
 [6]
 Plaintiff has abandoned its appeal from this ruling
 
 
 [7]
 Rule 9.02(d) provides:
 "Costs of maps, charts, models, summaries, computations and statistical comparisons are not taxable except by order of the court."
 
 
 [8]
 Section 2412 provides:
 "Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action. A judgment for costs when taxed against the Government shall, in an amount established by statute or court rule or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by him in the litigation. * * * "
 
 
 [9]
 Defendant has not pursued an appeal from the district court's order of July 11 insofar as it disallowed $20,417 to reimburse defendant for the services of a consulting firm
 
 
 [10]
 In addition, nothing in the record shows that the issue was raised below. At the conclusion of the March 12, 1979, oral opinion granting defendant's motion to dismiss the case, the district court took under advisement, inter alia, the defendant's request for attorneys' fees and ordered counsel for the parties to submit simultaneous briefs on April 20, 1979 (Com'n App. 31-32). Those briefs were ultimately filed on May 4 and did not mention the equal protection issue. Although the district court had not called for reply briefs, on May 15, 1979, defendant's counsel submitted a letter to Judge Warren. Four pages of this letter argued that plaintiff's bad faith made it liable for attorneys' fees. Thereafter, in one concluding sentence, defendant's counsel baldly stated without any support that "failure of the Equal Pay Act to allow an award of attorneys' fees to the prevailing party, while Title VII of the Civil Rights Act of 1964 and 42 U.S.C. 1988 permit such awards, violates the equal protection component of the Fifth Amendment to the Constitution of the United States." With the point relegated to such belated obscurity by defendant's counsel, the district court was justified in ignoring it in its July 11 opinion denying attorneys' fees to defendant